**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Equal Employment Opportunity Commission, | ) ) | No. CV 03-1210-PHX-PGR |
| Plaintiff, | ) ) | **ORDER** |
| Kelley J. Miles, | ) ) | |
| Plaintiff-Intervenor | ) ) | |
| vs. | ) ) | |
| The Boeing Company, et al., | ) ) | |
| Defendants. | ) | |

———————————————————

Pending before the Court is the Defendants' Motion for Summary Judgment (Doc.106). The Court now rules on the motion.

**I.     INTRODUCTION**

Kelley J. Miles ("Miles") was hired as a contractor for The Boeing Company ("Boeing") at its Mesa, Arizona facility in 1996.  In July of 1997, Boeing hired Miles as a full-time sheet metal mechanic.  Miles worked in the Mesa premod department from the commencement of her employment until on or about July 29, 2004, when, at her request, she transferred to the Structures Department in the Apache Final Assembly area where she remains employed today.

Boeing's premod group is responsible for tearing down Boeing's older Apache helicopters in preparation for upgrading the helicopter to become an Apache Longbow.

1    Boeing employs workers on two shifts in the premod department.  The first shift currently

2    works from 5:30 a.m. to 1:30 p.m., and the second shift works from 2:30 p.m. to 11:00 p.m.

3    Starting in  October 1999, Miles worked on the second shift.  Kevin Nunimaker is the first

4    level supervisor for the premod department on first shift, and he was  Miles's supervisor from

5    1998 until March 2001.  In March 2001, Jeff Luidhardt became Miles's direct supervisor.

6    Luidhardt remained Miles's supervisor until she transferred out of the premod department in

7    July, 2004.

8         During the time relevant to this case, the premod department divided work into teams

9    known as cells.  Miles was a part of cell 4 which was principally responsible for performing

10   the holefill function.  During the period at issue, Miles was teamed with co-worker, Dihn

11   Luu, as well as other co-workers.

12        Miles alleges that punctuated throughout her employment in the premod department,

13   she was subjected to workplace sexual and gender-based harassment, and that she was

14   retaliated against for complaining about that alleged harassment.  Miles filed a charge of

15   discrimination with the Equal Employment Opportunity Commission ("EEOC") on June 5,

16   2001, alleging retaliation and sex discrimination.  This first charge of discrimination alleged

17   that Manny Cervantes, a co-worker, subjected her to physical and verbal harassment and that

18   both Todd Blough and Cervantes had spread false sexual rumors about her.  The first charge

19   also alleged that her co-workers took her tools, hid them and broke them, and that her work

20   cart was trashed on May 17, 2001.

21        On August 5, 2001, Miles filed a second charge of discrimination with the EEOC

22   alleging retaliation.  The second charge stated that Kevin Nunimaker told others that Miles

23   had a list of people she was going to take to human resources, that co-worker John Byrd had

24   called her derogatory names, and that Richard Clark had told her he could not assist her with

25   her complaints because she had already brought a charge to the EEOC.  The EEOC issued

26   a cause determination on both charges on March 12, 2002.

27        On June 25, 2003, the EEOC filed the present lawsuit, and Miles filed her Complaint-

28   In-Intervention on September 19, 2003.  Plaintiffs' Complaint contains a list of alleged

1  incidents which purportedly establish the following: (1) two co-workers subjected Miles to

2  sexual harassment before June 2, 2001; (2) Miles experienced a hostile working environment

3  based on her gender during her employment with Boeing; and (3) Boeing perpetrated

4  unlawful retaliation against Miles because she complained about the alleged unlawful

5  harassment.  Many of the incidents and conduct alleged are claimed to have contributed to

6  both the harassment and the retaliation Miles experienced.

7  **II.    LEGAL STANDARD AND ANALYSIS**

8       The standard for summary judgment is set forth in Rule 56(c) of the Federal Rules of

9  Civil Procedure. Under this rule, summary judgment is properly granted when: (1) no

10 genuine issues of material fact remain; and (2) after viewing the evidence most favorably to

11 the non-moving party, the movant is clearly entitled to prevail as a matter of law.  Fed. R.

12 Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986);  Eisenberg v. Ins. Co. of

13 N. Am., 815 F.2d 1285, 1288-89 (9th Cir. 1987).    The Defendants maintain that the

14 Plaintiffs have not, and cannot, set forth specific facts to demonstrate a genuine issue of

15 material fact for trial.

16      **A.    Gender-Based and Sexual Harassment**

17      According to the Plaintiffs, since at least January 2001, the Defendants have engaged

18 in unlawful employment practices in Arizona, in violation of Section 703(a) of Title VII, 42

19 U.S.C. § 2000e-2(a), by subjecting Miles to harassment, based on her female gender, that

20 altered her conditions of employment and created a hostile work environment.  Under Title

21 VII, it is unlawful for an employer to "discriminate against any individual with respect to his

22 compensation, terms, conditions, or privileges of employment, because of . . . sex."  42

23 U.S.C. § 2000e-2(a)(1).  Sexual harassment in the form of a hostile work environment

24 constitutes sex discrimination.  Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 64 (1986).

25 To prevail on a hostile environment claim, the Plaintiffs must establish a "pattern of ongoing

26 and persistent harassment severe enough to alter the conditions of her employment."  Draper

27 v. Coer Rochester, Inc., 147 F.3d 1104, 1108 (9th Cir. 1998).  To satisfy this requirement, the

28 Plaintiffs need only prove that Miles's workplace was "both objectively and subjectively

1    offensive, one that a reasonable person would find hostile or abusive, and one that the victim

2    in fact did perceive to be so." Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998).

3    In addition, the Plaintiffs are required to prove that any harassment took place because of

4    Miles's gender. Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 79 (1998). In sum,

5    to prevail on her hostile work environment claim premised on sexual harassment, Miles must

6    show the following: (1) that she was subjected to verbal or physical conduct of a sexual

7    nature; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe

8    or pervasive to alter the conditions of her employment and create an abusive work

9    environment. Gregory v. Widnall, 153 F.3d 1071, 1074 (9th Cir. 1998).

10        To determine whether an environment is sufficiently hostile or abusive to violate Title

11   VII, a court must look at "all the circumstances," including the "frequency of the

12   discriminatory conduct; its severity; whether it is physically threatening or humiliating, or

13   a mere offensive utterance; and whether it unreasonably interferes with an employee's work

14   performance." Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993). The required level of

15   severity or seriousness "varies inversely with the pervasiveness or frequency of the conduct."

16   Ellison v. Brady, 924 F.2d 872, 878 (9th Cir. 1991). The objective severity of the harassment

17   should be judged from the perspective of a reasonable person in Miles's position, considering

18   all the circumstances. Oncale, 523 U.S. at 81-82.

19        Assuming that a reasonable person would find a workplace hostile, if the victim "does

20   not subjectively perceive the environment to be abusive, the conduct has not actually altered

21   the conditions of the victim's employment, and there is no Title VII violation." Harris, 510

22   U.S. at 21-22. A court must determine whether the victim, through his or her conduct,

23   indicated that the alleged conduct was unwelcome. Meritor, 477 U.S. at 68.

24        Miles's sexual harassment claim is primarily based on the alleged conduct of two co-

25   workers. Furthermore, neither of the two co-workers held positions as supervisors or

26   managers. Accordingly, in order to establish a Title VII hostile work environment claim

27   based on these events, the Plaintiffs must prove that Boeing was negligent. Such negligence

28   can be established by showing that Boeing knew or should have known of the harassment

1    but did not take appropriate steps to address it. See Swinton v. Potomac Corp., 270 F.3d 794,

2    803 (9th Cir. 2001); Nichols v. Azteca Restaurant Enters., 256 F.3d 864, 875 (9th Cir. 2001).

3         The Plaintiffs maintain that Miles endured sexual harassment by co-worker Manny

4    Cervantes beginning in 1998.  The alleged harassing conduct included Cervantes grabbing

5    Miles, touching her in an effort to try and rub her shoulders more than fifty times, trying to

6    hug her, and on one occasion, picking her up and carrying her around.  In addition, the

7    Plaintiffs maintain that Cervantes would also stick his tongue out at Miles then make

8    comments such as, "you know you want me" or, "you know you love me."  Furthermore,

9    Cervantes's verbal harassment of Miles included remarks such as "I love you" and "you want

10   me" and occurred almost daily.  According to the Plaintiffs, Miles regularly responded to

11   Cervantes's conduct by telling him to stop and to get away from her.

12        Although the harassing conduct Miles endured at the hands of Cervantes allegedly

13   occurred over a period of years, Miles did not officially complain to Boeing management,

14   including Human Resources, until June 6, 2001.  On this date, Miles gave Dick Mead a

15   written statement complaining about Cervantes conduct.   This prompted an investigation

16   into Cervantes's alleged misconduct where both Miles and her female co-worker, Luwanna

17   Woodruff, were interviewed.   As a result of the investigation into Miles's complaint,

18   Cervantes was discharged for misconduct on July 3, 2001.

19        The Plaintiffs maintain that Boeing cannot prove that it took immediate and

20   appropriate action to end the harassment by Cervantes; however, the Court disagrees.

21   Although the Plaintiffs state that Cervantes continuously harassed Miles between 1998 and

22   June, 2001, Miles did not report this conduct to Boeing until June, 2001 at which time

23   Boeing took prompt corrective measures.  The Plaintiffs contend that Boeing's Human

24   Resources Department had received a previous complaint about inappropriate sexual remarks

25   Cervantes made about a male co-worker's female family members, but failed to reasonably

26   respond to Cervantes's continued misconduct.   However, the undisputed facts show that

27   Boeing did, in fact, reasonably respond to the complaint it received about Cervantes. Boeing

28   investigated the complaint and issued Cervantes a corrective action notice.  The corrective

action notice stated that any further reports of inappropriate behavior could result in termination and that, due to the seriousness of the conduct, the corrective action notice would not be removed after the customary year.  According to the record before the Court, up until the time that Miles made a formal complaint concerning her interactions with Cervantes, there is no evidence that Boeing received any further complaints concerning his conduct.  The Plaintiffs claim that Kevin Nunimaker witnessed Cervantes's harassment of Miles, but they offer no admissible evidence to support such an allegation.  Furthermore, once Boeing learned about Cervantes's misconduct the evidence shows that it acted promptly to stop it.  Within a month from the day Miles complained, Cervantes was terminated.

In addition to the sexual harassment Miles endured at the hands of Cervantes, the Plaintiffs also point out that on May 30, 2001, Miles complained to her immediate supervisor, Jeff Luidhardt, that she had heard from someone that co-worker Todd Blough had made statements about Miles's sex life to some co-workers.  Luidhardt confronted Blough the same day and Blough effectively admitted his conduct by stating that he had "stepped on it."  Blough was given a verbal warning and told that he would get a written corrective action if there were any further incidents.[1]  Miles did not express any dissatisfaction about how the situation was handled, and since May 30, 2001, Miles has not reported any other inappropriate sexual comments directed at her from Blough.

The Plaintiffs state that Luidhardt's corrective action in regards to Blough was insufficient; however, it is also undisputed that Miles thanked Luidhardt for handling the situation and that neither Miles or anyone else has reported Blough for making inappropriate sexual remarks since.  Boeing's response to this incident appears both prompt and effective since Luidhardt confronted and reprimanded Blough the same day Miles reported his

---

[1]In his deposition, Blough testified that in addition to the verbal warning he received from Luidhardt, he was later given a reprimand and six-months probation from the Human Resources generalist, Dick Mead.  Mead took these steps after Miles complained about Blough's conduct on June 6, 2001.

1   misconduct.  Accordingly, Boeing cannot be held liable for Blough's misconduct.  Swinton,

2   270 F.3d at 803; Swenson v. Potter, 271 F.3d 1184 (9th Cir. 2001).

3       In addition to the above sexual harassment Miles complained of, the Plaintiffs also

4   allege that she was subjected to harassment based on her female gender.  On May 17, 2001,

5   the Plaintiffs maintain that Miles's co-workers took the hole fill cart Miles had created to

6   store the materials she needed to perform her job, tore off the labels she had put on it,

7   dumped some of the material into a box, took some of the parts and equipment stored there,

8   filled the cart with trash, and wrapped tape around it.  Miles immediately reported the trashed

9   cart to supervisor Lloyd Hatter.  Miles was given a camera to take digital pictures of the

10  trashed cart, but the Plaintiffs maintain that nothing else was done about the incident.

11      The evidence does not indicate that anyone, including Miles, ever saw anyone hide,

12  intentionally break, or inappropriately reset any tool from the holefill cart.  Furthermore, all

13  the tools Plaintiffs take issue with are the undisputed property of Boeing, and Miles was

14  never once accused of breaking or losing a tool.  Furthermore, Miles was not the only Boeing

15  employee who had access to and used the holefill cart as other employees, including Miles's

16  team, would have been impacted by these events in exactly the same way as Miles.  In

17  addition, the record reflects that Boeing conducted an investigation of the trashed tool cart,

18  but no one ever admitted to the conduct, no witnesses ever came forward, and the

19  investigation did not uncover the perpetrator.  Accordingly, Boeing could not issue any

20  disciplinary action.[2]

21      Around the same time the hole fill cart was trashed, the Plaintiffs contend that Blough

22  further harassed Miles by shaking an aircraft she was standing on to perform her work.  Miles

23  was standing on the deck of an aircraft, a flat area on the top middle, about six and one-half

24  inches to seven feet above the ground, without rails or walls on either side of her.  Miles's

25

26  _____

27      [2]The alleged incidents regarding the tools and tool cart occurred prior to Miles's complaints of harassment so they could not have been in retaliation for any protected conduct.  Furthermore, the Plaintiffs offer no evidence to suggest that such conduct could be attributed to Miles's female
28  gender as male co-workers also used the tools and tool cart and it was at all times Boeing property.

1    male co-worker, Dihn Luu, was also working on the deck beside her.   Blough allegedly

2    came over to the end of the tailboom, bent down, grabbed the end of it, and shook it really

3    hard.  Miles wobbled and quickly sat down.  According to the Defendants, Blough shook the

4    tailboom to get Miles's and Luu's attention so he could tell them it was break time.  The

5    Defendants maintain that this action is common in the pre-mod department and that there is

6    no evidence that it was dangerous or done to harm, harass, or intimidate Miles.  The Court

7    agrees.  The Plaintiffs offer no evidence to link Blough's actions to an improper motive.

8    Furthermore, Miles was not the only person on the tailboom.  The undisputed evidence

9    shows that Miles's male co-worker, Luu, was seated next to her when Blough shook the

10   tailboom, and the action was directed at Luu as much as it was Blough.  In addition, Luu

11   testified that his co-workers regularly shook the tailboom to get his attention while he worked

12   on the airframe otherwise he would not be able to hear them.

13         To support the hostile environment claim, the Plaintiffs also point to an incident where

14   a Boeing supervisor, Kevin Nunimaker, called Miles a "fucking crybaby" because she had

15   complained that some of her fasteners were messed up, and that he occasionally called Miles

16   a whiner or  a troublemaker for complaining about her co-workers allegedly messing with

17   her tools.  However, there is no evidence that Nunimaker made this comment, or any others,

18   because of Miles's gender or because she was engaged in protected conduct.  Furthermore,

19   Miles was unable to remember any specific incident in which Nunimaker had actually called

20   her either a whiner or a troublemaker, or the circumstances under which he allegedly spoke

21   those words.[3]

22         As noted above, in order to state an actionable claim for hostile work environment,

23   a plaintiff is required to show that the conduct was sufficiently severe or pervasive to alter

24   the conditions of her employment and create an abusive work environment.  See Ray v.

25   ───────────────

26         [3]The Plaintiffs also maintain that Nunimaker telling Miles that "[her] next piece of meat's
     here" in reference to the arrival of a new airplane in her work area constitutes sexual harassment
27   partly due to Miles interpreting the statement to have a sexual meaning; however, this comment does
     not have any sexual connotation within the context in which it was made, therefore, it was not
28   objectively offensive.

1    Henderson, 217 F.3d 1234, 1245 (9th Cir. 2000); Gregory, 153 F.3d 1071.  The legal standard

2    for establishing a workplace harassment is high so that Title VII does not become a "general

3    civility code" for the workplace.  Faragher, 542 U.S. at 788.  Conduct that is offensive and

4    inappropriate cannot support a claim for hostile work environment unless it so pollutes the

5    workplace that it alters the conditions of the plaintiff's employment.  Manatt v. Bank of

6    America, N.A., 339 F.3d 792, 798 (9th Cir. 2003).  It is the Court's conclusion that the

7    Plaintiffs have failed to establish that any of the conduct alleged herein supported by

8    admissible evidence was sufficiently severe or pervasive to alter Miles's conditions of

9    employment.  Furthermore, there is insufficient evidence to associate the alleged misconduct

10   with Miles's female gender.  Harassment based on personal animosity, rumors or other

11   information is not discrimination based on gender and cannot support a claim under Title VII.

12   See Oncale, 523 U.S. at 79-80. Although it is abundantly clear to the Court that Miles and

13   some of her co-workers had a less than ideal working relationship, the Court cannot

14   determine based on the admissible evidence before it that there is an issue of genuine

15   material fact as to whether that relationship was pervaded by gender discrimination.

16          **B.    Retaliation**

17          The Plaintiffs second claim is that, since at least January, 2001, the Defendants have

18   engaged in unlawful retaliatory practices in violation of Section 704(a) of Title VII, 28

19   U.S.C. § 2000e-3(a) by retaliating against Miles because she opposed the unlawful gender-

20   based harassment by filing a complaint with Defendants' Human Resources Department and

21   a charge with the EEOC.  To make out a prima facie case of retaliation, an employee must

22   show that (1) she was engaged in a protected activity; (2) her employer subjected her to an

23   adverse employment action; and (3) a causal link exists between the protected activity and

24   the adverse employment action.  Ray, 217 F.3d at 1240.  If a plaintiff asserts a prima facie

25   retaliation claim, the burden shifts to the defendant to articulate a legitimate non-

26   discriminatory reason for its decision.  Id.  If the defendant articulates such a reason, the

27   plaintiff bears the ultimate burden of demonstrating that the reason was merely a pretext for

28   a discriminatory motive.  Id.

1        In this case, the parties do not contest that Miles engaged in protected activities when

2   she complained of the alleged gender-based and sexual harassment to Boeing's Human

3   Resource Department and filed a complaint with the EEOC.  The heart of this dispute is

4   whether Miles suffered cognizable adverse employment actions.  An adverse employment

5   action is defined as "any adverse treatment that is based on a retaliatory motive and is

6   reasonably likely to deter the charging party or others from engaging in protected activity."

7   Vasquez v. City of Los Angeles, 349 F.3d 634, 646 (9th Cir. 2003); Ray, 217 F.3d at 1242-43.

8        The Plaintiffs maintain that Miles was retaliated against when her supervisor, Jeff

9   Luidhardt, issued her two corrective action notices (and one written reminder) for failing to

10  wear safety glasses while operating a pneumatic riveting gun.  However, the Court concludes

11  that the Plaintiffs cannot establish that the corrective action notices were unlawful retaliation,

12  as the issuance of the corrective action notices did not amount to adverse employment

13  actions.  See Kortan v. California Youth Authority, 217 F.3d 1104, 1112-1113 (9th Cir.

14  2000).  As the Defendant explains, the corrective action notices were merely documentation

15  of verbal counseling provided to Miles to discuss Miles's  failure to wear eye protection, and

16  the warnings did not constitute a reprimand, suspension, demotion, or a performance review.

17  Furthermore, the Plaintiffs cannot assert that the corrective action notices were not deserved.

18  Indeed, Miles admits she was not wearing her safety glasses when she was issued the

19  corrective action notices.  Furthermore, it is undisputed that Boeing has a policy requiring

20  an employee to wear such eye protection when riveting.[4]

21       In addition, the Plaintiffs fail to show any causal connection between any protected

22  conduct and the issuance of the notices.  Luidhardt did not issue the first corrective action

23  notice until May, 2003, nearly two years after Miles's complaint to him concerning Todd

24  Blough's behavior.  The temporal proximity between Miles's complaint and the corrective

25

26  _____

27       [4] Greg McDonald testified that Luidhardt saw him on one occasion not wearing his safety
    glasses and he was not given a warning; however, McDonald stated that he did, in fact, have the
    safety glasses on his head when Luidhardt saw him.  Furthermore, Miles admitted that she was
28  repeatedly observed not wearing her safety glasses while was she riveting

1    action notices does not establish the requisite causal connection.  Two years is too great a

2    span of time to create an inference of retaliatory motive based on temporal nexus.  See Clark

3    County School Dist. v. Breeden, 532 U.S. 268 (2001) (action taken 20 months after protected

4    conduct insufficient to infer causation); see also, Manatt, 339 F.3d at 802 (nine months

5    between the protected activity and the adverse action was too much time to infer retaliatory

6    causation); Rath v. Selection Research, Inc., 978 F.2d 1087, 1090 (8th Cir. 1992) (termination

7    six-months after a protected complaint insufficient to establish inference of retaliation).

8         Lastly, Boeing has provided a legitimate reason for Luidhardt's actions: Luidhardt was

9    following a Boeing policy that is in no way discriminatory or retaliatory.  Issuing the notices

10   was a legitimate exercise of Luidhardt's supervisory duties and authority.  Furthermore, it is

11   undisputed that two months after Luidhardt issued the corrective action notice to Miles, he

12   issued one to a male employee for not wearing safety glasses which directly contradicts

13   Plaintiffs' discriminatory application argument.[5]

14        The Defendants also contend that Miles failed to exhaust her administrative remedies

15   regarding the corrective action notices she received.  It is fundamental that, to establish

16   federal court jurisdiction in Title VII claims, a plaintiff must exhaust her administrative

17   remedies before she files a lawsuit on those claims.  Sosa v. Hiraoka, 920 F.2d 1451, 1456

18   (9th Cir. 1990).  "Incidents of discrimination not included in an EEOC charge may not be

19   considered by a federal court unless the new claims are like or reasonably related to the

20   allegations contained in the EEOC charge."  Id.  Miles filed two charges with the EEOC, the

21   first claiming harassment and the second claiming retaliation.  However, neither of these

22   charges mention the subject of not wearing eye protection or the issuance of corrective action

23

24

---

25        [5]Although some employees testified as to their opinion that there was no policy requiring
26   the use of safety glasses while riveting, the undisputed evidence is that Boeing had a written policy
     in place requiring the wearing of eye protection while riveting.  Whether or not the employees
27   testifying knew of the policy is irrelevant.  Furthermore, although there is some testimony from
     Miles's co-workers that they did not receive a reprimand for failing to wear safety glasses, none of
28   these employees ever testified that Luidhardt saw them not wearing their safety glasses.

1   notices.  Likewise, the EEOC investigations and determinations did not encompass these

2   incidents.

3        Next, the Plaintiffs state that Miles suffered retaliation because Boeing refused to

4   further investigate Miles's internal complaints after she filed a charge with the EEOC.  The

5   Plaintiffs maintain that Boeing officer, Richard Clark, told Miles that there would be no

6   further investigation of her initial complaints because she had chosen to make the EEOC her

7   advocate.  However, the undisputed evidence provides that Clark explained to Miles that he

8   could not discuss with her the complaint she had pending before the EEOC, not that he would

9   not investigate her complaints.  Furthermore, Luidhardt explained to Miles that she was free

10  to use Boeing Human Resources Department and the EEO for any future complaints, which

11  Miles admittedly did on multiple occasions, even after the comment allegedly made by Clark.

12  It is the Court's conclusion that Clark's comment to Miles reflected his understanding of a

13  Boeing practice that if an employee files a charge with the federal EEOC, his obligation as

14  the Boeing EEO officer was to respond directly to the EEOC on matters relating to the

15  charge, and not to have contact with the complaining employee regarding the subject matter

16  of the charge because the EEOC had become the employee's advocate.  Clark's conduct does

17  not constitute an adverse employment action against Miles for exercising her Title VII right

18  to file a charge with the EEOC.  Boeing's policy was an exercise of the employer's right to

19  engage in reasonable defensive measures against the employee's charge.  See U.S. v. New

20  York City Transit Authority, 97 F.3d 672, 677 (2d cir. 1996); accord, Olsen v. Marriott

21  Intern., Inc., et al., 75 F. Supp. 2d 1052, 1075 (D. Ariz. 1999).

22       The Plaintiffs also claim that the unlawful retaliation Miles endured included

23  Nunimaker reporting to co-workers that Miles made an internal complaint, and warning them

24  to be careful around her because she had them on a list.  However, the Plaintiffs offer no

25  admissible evidence to support this contention.  The only evidence Plaintiffs offer in support

26  of this allegation is that Ted Manchengo told Miles that he had heard from another co-

27  worker, Frank Francisco, that Nunimaker made the comment.  Francisco, however, denies

28  having heard Nunimaker say anything similar, and Nunimaker's uncontroverted testimony

1   is that he never did.  Accordingly, such a contention must be disregarded and will not be used

2   to support Plaintiffs' hostile work environment or retaliation claims.

3          Next, the Plaintiffs maintain that several male co-workers expressed hostility toward

4   Miles by calling her "bitch" and other gender-based derogatory names.  However, the

5   Plaintiffs have failed to meet their burden of showing that Miles's co-workers use of the word

6   "bitch" was based on Miles's gender or protected conduct.  Without proof of unlawful

7   motivation, the use of the word "bitch" does not establish proof of gender discrimination as

8   a matter of law.  See, e.g., Costa v. Desert Palace, Inc., 299 F.3d 838, 861-62 (9th Cir. 2002)

9   ("Whether this term [bitch] is part of the everyday give and take of a warehouse environment

10  or is inherently offensive is not for us to say.").

11         The Plaintiffs also claim that in retaliation for her complaints of harassment,

12  unfounded accusations and conclusions about her work were made.  According to the

13  Plaintiffs, early in 2003, co-worker John Byrd made repeated, unfounded accusations that

14  Miles's work contained multiple errors.  Byrd's accusations were reviewed and agreed to by

15  engineers Dennis Wilson and Darren Jennings.  The Plaintiffs state that the problem did not

16  resolve until Miles brought in a higher-level engineer, Bryan Davis, who confirmed that her

17  work was correct.  Specifically, Byrd and Miles were working off two different meplans that

18  had two different specifications for the same task.  When the issue was brought to attention

19  of the engineers responsible for the meplans, it was determined that there were indeed two

20  different plans for the same work, and that Miles, and not Byrd, was working from the

21  correct plan.  The evidence shows that Byrd reasonably and appropriately questioned Miles

22  about doing work that did not conform to the plan from which he was working.  As the

23  Defendants correctly assert, this is nothing more than a manifestation of a good faith error.

24         The Plaintiffs contend that Miles was shunned due to her complaints and that her co-

25  workers mocked and swore at her all in retaliation for her protected conduct.  The Plaintiffs

26  maintain that since Miles's initial complaint to Boeing's Human Resources Department, she

27  has been shunned by several co-workers.  However, the Ninth Circuit has determined that

28  such conduct is not actionable under Title VII.  See, e.g., Ray, 217 F.3d at 1241 ("mere

ostracism by co-workers does not constitute an adverse employment action"); <u>Manatt</u>, 339 F.3d at 803 ("Mere ostracism in the workplace is not grounds for a retaliation claim"); <u>Strother v. Southern California Permanente Medical Group</u>, 79 F.3d 859, 869 (9th Cir. 1996) ("For example, mere ostracism in the workplace is not enough to show an adverse employment decision."). Furthermore, even if shunning was actionable under current Ninth Circuit standards, the Plaintiffs have failed to establish that she was shunned because of her protected activity, as opposed to some lawful factor, such as her co-workers simply disliking her.

In addition, the Plaintiffs assert that Miles suffered retaliation when she was falsely accused of damaging an aircraft. According to the Plaintiffs, in March 2002, supervisor Nunimaker and co-worker Fred Jones falsely accused Miles and her male co-worker, Dihn Luu, of damaging an aircraft in an effort to subject Miles to discipline. However, Plaintiffs contention is not supported by the evidence in the record. In fact, this contention is directly contradicted by Miles's own testimony. For example, when questioned regarding who was actually accused of damaging an aircraft, Miles admitted that it was her male co-worker, Luu, and not her. As such, the Plaintiffs cannot rely on this allegation as evidence of retaliation or a hostile work environment.

As further evidence for the retaliation claim, Plaintiffs maintain that on or about May 2-3, 2003, Luidhardt singled out Miles to yell at her at a high performance meeting and during a work-related argument they were having. During the high performance meeting, Miles was asked by Luidhardt for a list of tools he had requested. Miles stated that she had already given him the list, but Luidhardt responded by leaning toward Miles and pointing and yelling at her. According to the Plaintiffs, none of Miles's male co-workers received this type of treatment. However, neither incident can support a claim for retaliation because (1) the alleged conduct was isolated– two incidents occurring within a twenty-four hour period, and (2) the undisputed evidence establishes that Miles was not singled out in any way. The undisputed evidence reflects that during a six-month period of time, Luidhardt was reportedly ill-tempered with all of his team members, regardless of gender, including frequently yelling,

1    swearing and belittling them with little provocation.  Furthermore, there is no evidence to
2    link Luidhardt's conduct to any discriminatory motive due to Miles's gender or in retaliation
3    for any protected conduct.

4        In addition to the above allegedly retaliatory actions, the Plaintiffs maintain that in
5    December 2002, co-worker Jason Carter attempted to cause Miles to have a car accident
6    when both of them were driving home after work.  The Plaintiffs assert that Carter's actions
7    were retaliatory in nature.  However, as the Defendants correctly point out, Plaintiffs' 90-
8    page statement of facts contains no mention of this alleged incident.  The Plaintiffs'
9    supplemental statement of facts contains one citation to a passage from Luidhardt's
10   deposition where he stated that he did not know whether Miles had mentioned the incident
11   to him, but that he had heard about the situation somewhere.   At the most, this testimony
12   would establish that Luidhardt heard from some unknown source that Plaintiff and a co-
13   worker were almost involved in a collision away from work.  It is still inadmissible hearsay
14   under the Federal Rules of Evidence and cannot be used as evidence of retaliation.

15       Based on the foregoing, it is the Court's conclusion that Plaintiffs' retaliation claim
16   must fail as well because there is no genuine issue of material fact as to whether Miles
17   actually suffered any adverse employment action, nor has the Plaintiff met its burden of
18   establishing that any of alleged actions were motivated by Miles's participation in protected
19   conduct.  Accordingly,

20       IT IS ORDERED that the Defendants' Motion for Summary Judgment (Doc. 106) is
21   GRANTED.

22
23                     DATED this 28th day of September, 2005.
24
25
26   _____
27   Paul G. Rosenblatt
     United States District Judge
28